## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
)
**VINCENT VICTOR ROGGIO,**                     )
)
**Plaintiff,**                                      )
)               **Civil Action No.**
**v.**                             )               **10-40076-FDS**
)
**WILLIAM J. GRASMUCK and**                     )
**EDWARD BACENER,**                             )
)
**Defendants.**                                 )
———————————————————————     )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**SAYLOR, J.**

This is a civil action involving an alleged violation of the Massachusetts Criminal

Offender Record Information ("CORI") statute, Mass. Gen. Laws ch. 6 § 172.  Plaintiff Vincent

Roggio alleges that defendants William Grasmuck and Edward Bacener improperly obtained and

disseminated his criminal record from a federal computer database in violation of CORI.[1]

The case was tried to the Court without a jury from September 23 to 26, 2013.  For the

reasons set forth below, the Court finds in favor of plaintiff, and will award exemplary, but not

actual, damages.

## I.   Introduction

Plaintiff Vincent Roggio is a resident of Rumson, New Jersey.  In 1987, he was convicted

on several counts of mail fraud and making false statements in the United States District Court

for the Southern District of Florida.  He served seven years in prison for these crimes.  After his

release from prison in 1994, he established several businesses in New Jersey.

Defendant William Grasmuck, a resident of Massachusetts, was a detective in the

Gardner, Massachusetts Police Department.  Defendant Edward Bacener, a resident of

---

[1] Defendant Bacener's name has been incorrectly spelled "Basener" in all the previous pleadings in this case.

Massachusetts, was employed as a court officer in the Gardner District Court.  He was also employed by the Hannaford's supermarket in Gardner as a security officer.

Roggio alleges that on the morning of January 11, 2006, Grasmuck improperly obtained access to his criminal record at Bacener's request.

At the time, Roggio was involved in an acrimonious relationship with a former business partner, Zachary Emmanouil, who was preparing to file a lawsuit against him.  Roggio alleges that one of the co-defendants in this case sent his criminal record to Emmanouil, who forwarded it to his attorneys.

In March 2006, Roggio's criminal record appeared in the public filings of a lawsuit filed against him by Emmanouil in the United States District Court for the District of New Jersey.  It also appeared on a website, Gibraltar-Granite.com.  Roggio found out about the website when his wife viewed it in November 2006.

In 2008, Roggio filed suit against the FBI in New Jersey, alleging improper disclosure of his criminal record.  He learned through discovery that his criminal record on the FBI system had been accessed in 2006 by the Gardner Police Department.

Roggio alleges that he incurred substantial attorney's fees as a result of the dissemination of his criminal record.  He also alleges that he suffered emotional distress from a criminal investigation launched because of the unauthorized release of his criminal record.

Roggio filed this action on April 23, 2010.  The complaint alleges a claim under the CORI Act.  He seeks compensatory and punitive damages and attorney's fees.

## II.   Findings of Fact

### A.   Vincent Roggio

1.   Vincent Roggio is a resident of New Jersey.  (*See* Tr I:  26).

2.   In 1987, Roggio was convicted on several counts of mail fraud and making false statements in the United States District Court for the Southern District of Florida.  (Tr. I: 24-25, Ex. 1).

3.      Roggio was released from prison in 1994.  (Tr. I:  25).

4.      Roggio has been arrested on multiple occasions, for multiple offenses, going back to

        1973.  (Tr. I:  35-40; Ex. 1).  The state jurisdictions involved included Florida, among

        others.  (*See* Tr. I:  120-21; Ex. 38).  None of those charges, other than the 1987 mail

        fraud conviction, resulted in a criminal conviction.  (Tr. I:  35-40; Ex. 1).

5.      Roggio owned and operated several companies in New Jersey following his 1994 release

        from prison, including a granite supply company called Gibraltar Granite.  (Tr. I:  28-30).

**B.      William Grasmuck and Edward Bacener**

6.      William Grasmuck is a resident of Massachusetts.  (*See* Tr. II:  38-39).  At all relevant

        times, Grasmuck was a detective working for the Gardner Police Department.  (*Id.*).

7.      Edward Bacener is a resident of Massachusetts.  (*See* Tr. II:  76-77).  At all relevant

        times, Bacener was working as a court officer at the Gardner District Court and part-time

        as a security guard at the Hannaford's supermarket in Gardner.  (Tr. II:  76-78).

8.      There is no evidence that either Grasmuck or Bacener has ever met or spoken to Roggio,

        or had any direct dealings with him of any kind.  (*See* Tr. II:  65, 70-71, 82).

**C.      The FBI Criminal Records System**

9.      The Criminal Justice Information Services division of the FBI serves as the nation's

        central repository for identification and criminal history record information.  (Ex. 4 ¶ 5).

        It includes, among other things, the National Crime Information Center ("NCIC").  (*Id.*).

10.     The NCIC is a nationwide computerized information system.  (*Id.* ¶ 6).  Among other

        things, it serves as the telecommunications link to an automated system known as the

        Interstate Identification Index ("Index").  (*Id.*).

11.     Federal, state, and local law enforcement officers can conduct an inquiry of the Index to

        determine whether a person has a criminal history record, and if so the contents of that

        record.  (*See id.* ¶¶ 6-7).

12.     Under some circumstances, it is possible, based on the nature of the information and the

formatting, to ascertain whether a particular criminal history record was created from an inquiry to the Index.  (*See id.* ¶¶ 7-11).

13.   The FBI computer systems create a record every time a law enforcement official conducts a search of the Index.  (*See id.* ¶¶ 12, 14).

   **D.    The Access to Roggio's Record by the Gardner Police Department**

14.   At some point on January 11, 2006, Grasmuck received a telephone call from Bacener at the Gardner Police Department.  (Tr. II:  81; Ex. 12.1).  That call was made to a telephone line that was normally recorded.  (Ex. 12.1).

15.   In the telephone call, Bacener asked Grasmuck if he could run a criminal history for him on an out-of-state individual.  (*Id.*).  Grasmuck told Bacener to hold on and switched the call to an unrecorded telephone line.  (*Id.*).

16.   At 7:48 a.m. on January 11, 2006, Grasmuck asked Heather Newton, a dispatcher working at the Gardner Police Department, to run a criminal record for Vincent Roggio. (Ex. 7 at *35).

17.   In the Gardner police log, Newton recorded that Roggio was a suspect in a shoplifting at Hannaford's supermarket.  (*Id.*).

18.   Although there is no direct evidence, it is a reasonable inference that Grasmuck told Newton that Roggio was a shoplifting suspect.  (*See id.*; Tr. II:  60).

19.   Bacener was working at the Gardner District Court on the morning of January 11, 2006. (Tr. II:  48-49).  He was not working at the Hannaford supermarket that day.  (Tr. II:  82).

20.   Grasmuck and Bacener both testified that before 2009, they had never met or heard of Roggio.  (Tr. II:  70-71, 82).  Grasmuck also testified he could not remember a time where he had begun a shoplifting investigation by running a suspect's criminal record. (Tr. II:  40).

21.   Roggio testified that he has never been to the Hannaford supermarket in Gardner.  (Tr. I: 77).

22.   The Hannaford supermarket in Gardner has no record of a suspected shoplifting incident involving Roggio.  (Ex. 8).

23.   Although there is no direct evidence, it is a reasonable inference that Newton accessed the FBI Index, and prepared a compilation of Roggio's criminal record, in response to Grasmuck's request.  (*See* Tr. II:  41-42; Ex. 7 at *35).

24.   According to the evidence, Grasmuck had no reason to access the information other than to provide it to Bacener.  (*See* Tr. II:  61).

25.   It is a reasonable inference that Grasmuck received that criminal record compilation and provided it to Bacener in response to his request.

26.   Grasmuck was deposed during Roggio's lawsuit against the FBI.  (Tr. II:  66; Ex. 14). When asked whether he had accessed or disseminated Roggio's criminal record, he refused to answer based on his Fifth Amendment right against self-incrimination.  (Ex. 14 at *28-29).  He did so on the advice of the City of Gardner's counsel.  (Tr. II:  67-68, 72-73).  Grasmuck was not individually represented by counsel at the deposition.  (Tr. II: 72).

**E.     The New Jersey Action Against Emmanouil**

27.   In 2006, Roggio was in a dispute with his former attorney, Zachary Emmanouil.  (Tr: I: 30-32).  Emmanouil was represented by Mitchell Pascual, an attorney in New Jersey. (Tr. I:  127).

28.   On January 11, 2006, Emmanouil e-mailed a draft statement of facts for a civil complaint against Roggio to Pascual.  (Ex. 9).  The e-mail contained two attachments:  a summary of claims and a statement of facts.  (*Id.*).

29.   The e-mail and attachments dated January 11, 2006, did not contain any references to Roggio's alleged criminal history.  (Letter Order, *Roggio v. F.B.I.*, No. 08-04991, Dkt. No. 105 at *2 (Apr. 27, 2011)).

30.   On March 7, 2006, Emmanouil filed the complaint with the United States District Court

for the District of New Jersey.  (Ex. 2).  Paragraph 254 of that complaint included a listing of Roggio's alleged criminal history.  (Ex. 2 ¶ 254).

F.      **Links Between Defendants and the New Jersey Parties**

31.    There is no direct evidence of any communication or other connection between Grasmuck or Bacener in Massachusetts, on the one hand, and Emmanouil or Pascual in New Jersey, on the other.

32.    There is no evidence of any motive or reason for Grasmuck or Bacener to supply criminal record information about Roggio to Emmanouil or Pascual.

33.    There are two pieces of evidence suggesting that Grasmuck and/or Bacener may have provided a copy of Roggio's criminal record information to Emmanouil and/or Pascual in New Jersey.

34.    First, there is a correlation between the timing of the access of the record in Gardner (which occurred on January 11, 2006) and the preparation of the draft complaint in New Jersey (which was underway on January 11, 2006).  (Exs. 7 at *35, 9).

35.    Second, the nature and formatting of the criminal record information set forth in Paragraph 256 of the Emmanouil complaint suggest that it was based from information maintained in the FBI Index.  (Ex. 4 ¶¶ 10-11).  As described below, there were only two such inquiries in the period from 2004 to 2006, one by the Customs Service in Florida in 2004 and one in Gardner.  (*Id.* ¶¶ 12-15).

36.    The information set forth in Paragraph 254 of the Emmanouil complaint is generally non-public, other than (1) the federal conviction in 1987 and (2) certain information from the state of Florida.  (*See* Exs. 1, 2 ¶ 254; Fla. Stat. § 943.053).

37.    The state of Florida allows any member of the public to obtain another person's criminal record in that state for a fee of $24.  Fla. Stat. § 943.053.[2]

---

[2] The Court takes judicial notice of the statute.  *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012) ("It is well established that district courts may take judicial notice of state law without plea or proof.") (internal quotations omitted).

G.      **The Gibraltar-Granite Website**

38.     Sometime in October or November 2006, Roggio's wife discovered a website called
        Gibraltar-Granite.com.  (Tr. II:  22).  The website contained a printout of Roggio's
        alleged criminal history.  (Ex. 3).  The website also included information on other legal
        actions against Roggio, his driver's license, and his home address.  (*Id.*).

39.     There is no evidence as to who created the website.  It was not created by Roggio or
        Roggio's business, which was Gibraltar Granite, Inc. (without a hyphen).  (*See id.*).

40.     The website was taken down sometime in late 2008.  (Tr. II:  25).

41.     The nature and formatting of the criminal record information on the website suggest that
        the information was based on information maintained in the FBI Index.  (*See* Exs. 3, 4 ¶¶
        10-11).

H.      **The New Jersey Action Against the FBI**

42.     In 2008, Roggio filed a lawsuit against the FBI in the United States District Court for the
        District of New Jersey, alleging that the FBI had unlawfully disseminated his criminal
        record.  (Tr. I:  57-60).

43.     Based on the formatting of Roggio's criminal record, the FBI concluded that if it was
        derived from an unauthorized disclosure of information obtained from the Index, the
        access to the Index must have occurred between 2004 and 2006.  (Ex. 4 ¶¶ 10-11).

44.     In the course of discovery in the FBI litigation, the FBI determined and disclosed to
        Roggio that his FBI criminal record had been accessed twice between 2004 and
        2006—once in 2004 by the United States Customs Service in Florida and once on
        January 11, 2006, by the Gardner Police Department.  (*Id.* ¶¶ 12-15).

45.     There is no evidence in the record as to why the Customs Service accessed Roggio's
        criminal history in 2004.  (*See* Tr. I:  130).

I.      **Roggio's Claim for Attorney's Fees**

46.     Roggio claims damages in the form of attorney's fees, arising out of the lawsuits in New

7

Jersey against Emmanouil and against the FBI.

47.     Roggio testified that he attempted in the course of the Emmanouil lawsuit to find out how his criminal record had been revealed to Emmanouil's attorneys, and that he incurred attorney's fees as a result.  (Tr. I:  57-58).

48.     Attorneys from Wilentz, Goldman & Spitzer represented Roggio in his case against Emmanouil.  (Tr. I:  41).

49.     As noted, Roggio filed a lawsuit against the FBI in the United States District Court for the District of New Jersey, alleging that the FBI unlawfully disseminated his criminal record.  (Tr. I:  57-60).

50.     Attorneys from Ansell, Grimm & Aaron represented Roggio in his case against the FBI. (Tr. I:  58).

51.     Roggio did not introduce any actual bills or invoices from attorneys from either lawsuit.

52.     Roggio did not introduce any documentation that he paid any attorney's fees, costs, or expenses in connection with either lawsuit.

53.     Roggio did not introduce competent evidence from which the Court could reasonably conclude that he had incurred or paid attorney's fees in connection with either the Emmanouil or the FBI litigation as a result of the unlawful dissemination of his criminal record.

54.     To the extent that Roggio testified as to the amount of attorney's fees he expended, the Court does not find that testimony to be sufficiently specific or credible to support an award of damages, even assuming that causation and other requirements for proof of damages have been proved.  (*See* Tr. I:  41-70).

**J.      Roggio's Claim for Emotional Distress Damages**

55.     Suzanne Tempsick was a friend of Roggio's from New Jersey.  (*See* Tr. I:  70-71; Dep. of Suzanne Tempsick, *Roggio v. FBI*, 08-cv-04991, at *7-8 (Oct. 21, 2009) ("Tempsick Dep.")).

56.   On January 12, 2007, Tempsick invested $88,000 in Roggio's business, Gibraltar Granite.  (*Id.* at *16-20).

57.   In December 2007, Tempsick attempted to contact Roggio to get her $88,000 investment back, but could not reach him.  (*Id.* at *23-25).  She left several voicemail messages for him.  (*Id.*).

58.   Tempsick became "frustrated at not being able to contact" Roggio.  (*Id.* at *26).  As a result, she searched online for information about Roggio and Gibraltar Granite.  (*Id.*).  She discovered the website containing Roggio's criminal history.  (*Id.* at *26-27; Ex. 3).

59.   After reading the information on the website, Tempsick became "very concerned" about her investment in Gibraltar Granite.  (Tempsick Dep. at *27).  She began to believe Roggio may have cheated her out of her money.  (*Id.*).  She contacted the FBI, who referred her to the Monmouth County, New Jersey prosecutor's office.  (*Id.* at *38-39).

60.   As a result of Tempsick's concerns, the Monmouth County prosecutor's office began investigating Roggio for fraud.  (Tr. I:  71-74).  The investigation ended without any charges being filed.  (*See* Tr. I:  71-77).

61.   Roggio testified that he suffered emotional distress because of the investigation.   (Tr. I:  71-77).  He testified that he was uniquely affected by the possibility of going to jail for a crime he did not commit.  (Tr. I:  74-75).  He also testified he did not sleep or eat well.  (Tr. I:  75-76).

62.   There is no evidence that Roggio sought help from a medical professional for his alleged distress.  There is no evidence that he sought therapy, or that he took any kind of medication, as a result of his alleged distress.  (*See* Tr. I:  71-77).

63.   The Court does not credit Roggio's claims of emotional distress resulting from the Monmouth County investigation.

III.     **Conclusions of Law**

A.       **Elements of a Massachusetts CORI Claim**

1.      The Massachusetts Criminal Offender Records Information ("CORI") Act governs the

dissemination of criminal records in Massachusetts.  Mass. Gen. Laws ch. 6 § 172.[3]

2.      Among other things, the CORI Act states that "[a]ny individual or entity that receives or

obtains criminal record information from any source in violation of [the Act], whether

directly or through an intermediary, shall not collect, store, disseminate, or use such

criminal offender record information in any manner or for any purpose."  *Id.* § 172(l).

3.      The CORI Act also authorizes civil suits for damages arising from any violation of

sections 168 through 172 of the act.  Mass. Gen. Laws ch. 6 § 177.

4.      To prove a CORI violation, a plaintiff must show that (1) the information at issue was

protected under CORI; (2) the defendant received or obtained that protected information;

(3) the defendant collected, stored, disseminated, or used that protected information; (4)

the defendant did so outside the authority granted by the statute; and (5) the defendant

was at fault.  Mass. Gen. Laws ch. 6 § 172; *Bynes v. School Committee of Boston*, 411

Mass. 264, 270-71 (1991).

5.      If the defendant committed the violation willfully, the statute provides that the Court

shall award exemplary damages, costs, reasonable attorneys' fees, and disbursements.

*See* Mass. Gen. Laws ch. 6 §§ 172, 177.

6.      It is a crime under the CORI Act to request CORI information under false pretenses.

Mass. Gen. Laws ch. 6 § 178.  However, the statute does not create civil liability simply

for making an unauthorized request to obtain CORI.  *See id.* § 177 (authorizing civil suits

for violations of sections 168 through 175 of the act; criminal liability for illegal request

of CORI is in section 178).

---

[3] The CORI Act was amended on May 4, 2012.  Although an earlier version of the CORI Act was in effect at the time of the events in this case, neither party disputes that the current version controls.

1.     **Protected Information**

7.     "Criminal offender record information" is defined by the statute as "records and data in any communicable form compiled by a Massachusetts criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release."  Mass. Gen. Laws ch. 6 § 167.

8.     A "criminal justice agency" is defined by the statute as a "Massachusetts agency which performs as its principal function activities relating to crime prevention . . . ."  803 CMR 2.02.

9.     The FBI is not a Massachusetts criminal justice agency.  *See id.*

10.    The Gardner Police Department is a Massachusetts criminal justice agency.  *See id.*

11.    Federal criminal record information is not protected under CORI.  803 CMR 2.03(5).

12.    Public criminal record information is not protected under CORI.  *Id.*

13.    Because Roggio's 1987 conviction was both a federal conviction and a matter of public record, any information in his criminal record concerning that conviction is not CORI.  *See id.*

14.    Because Roggio's Florida criminal record can be accessed by any member of the public for a fee of $24, that information is public information, and therefore not CORI.  *See id.*; Fla. Stat. § 943.053.

15.    To "compile" records or data, under the CORI Act, means to gather and put them together in an orderly form.  *See* Webster's New World Dictionary 284 (3d ed. 1988).

16.    As noted, Roggio's criminal record information, which was stored in the database compiled by the FBI, was accessed by Heather Newton at Grasmuck's request.  (*See* Tr. II:  41-42; Ex. 7 at *35).

17.    Any information that was simply stored in the FBI database was not CORI, as defined by the statute, because it was not compiled by a Massachusetts criminal justice agency.  *See*

Mass. Gen. Laws ch. 6 § 167.

18.    However, once Newton made a request to the FBI system for Roggio's criminal record,

and the FBI system created a document in response to that request, a further

"compilation" occurred.  At that point, Roggio's criminal record information had been

compiled by the Gardner Police Department.

19.    Once Roggio's criminal record information had been compiled by the Gardner Police

Department, that information (other than the federal and Florida information) became

CORI and subject to the protections of the statute.  *See id.*

### 2.    **"Received" and "Obtained"**

20.    Grasmuck received and obtained Roggio's CORI in violation of the CORI Act on

January 11, 2006, when Heather Newton (an intermediary) provided it to him.

21.    Bacener received and obtained Roggio's CORI in violation of the CORI Act on or about

January 11, 2006, when Grasmuck provided it to him.

### 3.    **"Disseminated"**

22.    Grasmuck "disseminated" Roggio's criminal history to Bacener, within the meaning of

the CORI Act, on or about January 11, 2006.

23.    Bacener "disseminated" Roggio's criminal history to one or more unknown persons,

within the meaning of the CORI Act, at some point on or after January 11, 2006.

### 4.    **Absence of Authority**

24.    The CORI Act allows employees of criminal justice agencies to obtain CORI to the

extent "necessary for the actual performance of their criminal justice duties."  Mass. Gen.

Laws ch. 6 § 172(a)(1).

25.    At all relevant times, Grasmuck was an employee of the Gardner Police Department, a

Massachusetts criminal justice agency.  (Tr. II:  38-39).  His receipt and dissemination of

Roggio's CORI would have been authorized if necessary for the actual performance of

his criminal justice duties.  Mass. Gen. Laws ch. 6 § 172(a)(1).

26. Grasmuck's only legitimate criminal justice reason for accessing and disseminating Roggio's CORI was if Roggio were a shoplifting suspect at Hannaford's supermarket. (*See* Ex. 7 at *35).

27. There is no record evidence that Roggio was actually a shoplifting suspect at Hannaford's.  (*See* Tr. I:  77; Tr. II:  48-49, 82; Ex. 8).

28. Among other things, (a) Grasmuck knew or reasonably should have known that Bacener was not at the supermarket when he called; (b) Grasmuck generally did not run the criminal records of shoplifting suspects; (c) Hannaford's supermarket has no record of Roggio being a shoplifting suspect; and (d) Grasmuck never met or heard of Roggio before 2006.  (Tr. II: 48-49, 70-71; Ex. 8).

29. Grasmuck accessed and disseminated Roggio's CORI outside the actual performance of his criminal justice duties.

30. At all relevant times, Bacener was not an employee or representative of a criminal justice agency.  (Tr. II:  76-78).

31. Any dissemination of Roggio's CORI by Bacener was therefore without authority.  Mass. Gen. Laws ch. 6 § 172(a).

### 5.   <u>Fault</u>

32. The CORI Act does not provide for strict liability; instead, the plaintiff must not only prove that the defendant violated the statute, but also that the defendant is at fault.  *Bynes*, 411 Mass. at 270-71.

33. Grasmuck obtained and disseminated Roggio's CORI intentionally.  He did not obtain or disseminate it by accident, mistake, or neglect, or without knowledge that it was protected by statute.  Grasmuck therefore was at fault.

34. Bacener obtained and disseminated Roggio's CORI intentionally.  He did not obtain or disseminate it by accident, mistake, or neglect, or without knowledge that it was protected by statute.  Bacener therefore was at fault.

13

### 6.    Willful Violations

35.    A plaintiff may obtain exemplary damages and attorneys' fees and costs for a willful

violation of the statute.  *See* Mass. Gen. Laws ch. 6 § 177.

36.    For a violation to be "willful," the defendant must have actual knowledge that he is

violating the duties and requirements of the statute.  *Cf. Montanez v. Bagg*, 24 Mass.

App. Ct. 954, 956 (1987).

37.    Grasmuck was an experienced police officer.  (Tr. II: 38-39).  When Bacener called, he

switched the telephone conversation to a private line.  (Ex. 12.1).  Grasmuck also knew

or reasonably should have known that Roggio was not likely to be a shoplifting suspect.

(Tr. II:  48-49; 62-63).

38.    Neither Grasmuck nor Bacener testified that they had an innocent motive for their

actions, or testified that they did not know or understand the duties and requirements of

the statute.

39.    According to the preponderance of the evidence, Grasmuck knew that the actions that he

took in accessing and disseminating Roggio's criminal history amounted to a violation of

the CORI statute.

40.    According to the preponderance of the evidence, Bacener knew that the actions he took

in disseminating Roggio's criminal history amounted to a violation of the CORI statute.

### 7.    Conclusion

41.    According to the preponderance of the evidence, Grasmuck willfully violated the CORI

Act by obtaining and receiving Roggio's CORI, and disseminating Roggio's CORI to

Bacener.

42.    According to the preponderance of the evidence, Bacener violated the CORI Act by

obtaining and receiving Roggio's CORI and willfully disseminating it to unknown

persons.

**B.      Damages**

43.      The CORI Act allows a plaintiff to recover compensatory damages resulting from a

CORI violation.  Mass. Gen. Laws ch. 6 § 177.

44.      The statute also provides for exemplary damages for willful violations, as well as costs,

attorneys' fees, and disbursements.  *Id.*

**1.      Compensatory Damages**

45.      Roggio claims two classes of compensatory damages:  attorney's fees related to work

performed to locate the source of his CORI and remove it from the public, and

compensation for emotional distress suffered as a result of the Monmouth County

prosecutor's office investigation.

46.      To be awarded compensatory damages, a plaintiff must prove that the defendant's

conduct was a direct and proximate cause of some injury to the plaintiff.  *Anza v. Ideal

Steel Supply Corp.*, 547 U.S. 451, 457-58 (2006).

47.      Roggio has not proved any damages based on any alleged incurring or payment of

attorney's fees in the Emmanouil lawsuit or the FBI lawsuit.

48.      Roggio has not proved any damages based on his alleged emotional distress.

49.      The Court makes no finding as to whether Roggio's alleged injuries were proximately

caused by any CORI Act violation by any defendant.

**2.      Exemplary Damages**

50.      The CORI Act provides for an award of exemplary damages of not less than $100 and not

more than $1,000 for each willful violation of the statute.  Mass. Gen. Laws ch. 6 § 177.

51.      Exemplary damages are meant to punish and deter willful violations.  *See BMW of N.

Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996).

52.      In calculating exemplary damages, courts look at the degree of reprehensibility, the

disparity between the harm suffered by the plaintiff and the possible award, and the

difference between the award and possible civil penalties in comparative cases.  *BMW,*

517 U.S. at 575.

53.     After review and consultation of those factors, and the evidence in this case, the Court

awards damages as follows:

      a.     The Court awards damages to Roggio against Grasmuck in the amount of

              $200 for a willful CORI Act violation.

      b.     The Court awards damages to Roggio against Bacener in the amount of

              $200 for a willful CORI Act violation.

      **3.     Attorney's Fees**

54.     Roggio is entitled to reasonable attorney's fees, costs, and disbursements resulting from

this action.

55.     Roggio shall file any claim for attorney's fees, costs, and disbursements, together with

any supporting documentation, on or before December 6, 2013.

**So Ordered.**

                    /s/ F. Dennis Saylor
                    F. Dennis Saylor IV
Dated:   November 19, 2013      United States District Judge